The appellant, you may proceed. May it please the Court, good morning. I would indicate for the record that with me at council table is co-counsel David Garrison and also the plaintiff in this case, Michael Lynch. Your Honors, I know that you have read the briefs, and I know that you would not appreciate my repeating them, and I have no intention to do so. Great. I simply want to make a couple points of emphasis, and then I would reserve the balance of my time to respond to questions and any comments by council for Trendwest. I've been accused in this case of, I think, paraphrastic circumlocution and hyperbolic rotamontad. Had to look those all up myself. I did too, and I have to credit council for a very lovely turn of phrase, but I strenuously dispute the characterization. We genuinely believe in this case, without hyperbole, that this is a situation in which a manifest miscarriage of justice has occurred. My client has been deprived of an opportunity to try his case. In the words of the Rozier v. Ford Motor Company case, the case that was tried was not the case of the facts. It was the case of the hypothetical set of facts. Just a minute. I don't think the clerk's running your clock. Oh, you got a little extra time there. Okay. All right. As I was saying, I don't believe that what we've tried was the case of the facts. It was the case of those facts that Trendwest selected to disclose to the court. Let me ask you a question. One of the things that was curious to me is, with regard to the lost damage claim, had he known of the additional videos that surfaced in the other litigation, why didn't you claim damages for the lost performance rights of the podium tape that had been played for several? Well, in the context of what was known at that time, Your Honor, the podium tape was a nine-minute tape which consisted of approximately 90 seconds of Mr. Lynch's material. The take-home tape was approximately a 45- or 48-minute tape that had six minutes of his material. And he had engaged in transactions of that type where there was some limited use of his material and a massive duplication of his material, and he structured those transactions on the basis of a per-copy fee because there were a lot of copies made. But if we take the damages that the jury ultimately awarded and multiply them by the number of tapes, it still comes out to only a few hundred dollars, doesn't it? Well, it does if you stick with that theory. Right. But to stick with that theory is to impose on Mr. Lynch the conclusive presumption that had he known from the outset that, in addition to the 90 seconds of material publicly performed, there was six minutes of material also publicly performed, we submit, and Mr. Lynch has stated in a sworn declaration, that he would have indeed formulated a different measure of damages. You're not suggesting that we set aside the judgment and verdict, are you? I am not. I don't think justice requires that. We certainly do, Your Honor. Now you want some more. So you're going to go through the whole exercise for $200? No. Your Honor, first, $200 is not even the right measure. If Mr. Lynch had never granted a license to use his work in the way that we now know Trent West used his work, so how he would have formulated his theory of damages had he known all of the information is an open question. And certainly he shouldn't be presumed. But it sounds to me like you want us to reopen the prior ruling with regard to the indirect damages claim, which I think is law of the case based on the ruling by the prior panel. So you really are asking us, I think, to reopen. You want to hang on to the judgment, but you want to expand your theory of recovery by getting back into an issue that had previously been decided adversely to your cause. That is absolutely correct. You understand our position precisely correctly, and I believe that justice necessitates that result, and let me tell you why. Okay. I think I have given a plenary explanation of it in the briefs, but I would like to highlight a certain point. Let me ask a follow-up question to the one that I asked you earlier about the podium tapes, and that is tell me how that theory would be different if you chose not to pursue it with regard to the podium tapes, even though we were only talking about 90 seconds worth of material. Why does the difference between 90 seconds and six minutes make a difference with regard to how you would have tried the case, since you knew about the podium tapes when you tried it? Well, it would have made a difference because it would have opened, it would have suggested to counsel, and certainly if we have the opportunity to retry on the direct damages part of the case, we will pursue the theory of quantifying a license, the value of a license granted for what amounts, based upon the information on the record, to hundreds of thousands of public performances of the work, and it's a much more quantitatively substantial volume of work, but more important than that. If you had known of the existence of these tapes during the first trial, your allegation is we would have changed our theory of damages. Would you have proceeded on two different measures of damages for two different types of tapes? Could you have done that? Oh, I certainly could have. We want duplication damages for this set of tapes. We want performance damages for that set of tapes. We don't have to have a unified theory for two sets of tapes. Oh, I think that's absolutely true. There are two discrete violations of copyright. The take-home tapes was a violation of the distribution and copying right. The loop tapes, as well as the podium tapes, are both violations of the performance right. The quality of the performance right violation, which was withheld and concealed by TrendWest, is manifestly and massively different than the quality of the performance that we did know about. I apologize for getting hung up on this, but I really am hung up on the podium tapes because I don't understand what the difference is between the use made in the podium tapes when they're displayed and the take-home tapes. It seems to me that the use is the same and the theory would have to be the same. Well, Your Honor, I suggest that it isn't, and let me tell you some of the reasons. Part of the reason that I have to perhaps speculate or at least conjecture is that we never had a chance during the course of the trial to develop the discovery that would have allowed us to determine, in part from TrendWest's own internal information, how they viewed the importance of the use of the loop tapes. But let me suggest this. What we do know is that the sales process that TrendWest used involved soliciting people to come to these sales rooms, which for the most part were in urban centers. They weren't in resort areas. Some of them were, but most of the ones were in urban areas. They were just office buildings. People would be brought there on the offer of a free gift, typically a trip to Vegas. I understand from the record how they were displayed, but I don't see the substantive distinction in the evidence based on the use of the tapes. As I understand the podium tapes, they were used during sales presentations, let's say in a meeting room, with a room full of prospective customers, and the tape was played. Whereas in the office, the prospective customers are sitting in the waiting area waiting to see a sales associate while the tape is playing. I don't understand why that's any different. Your Honor, I'm confident that if we're allowed the opportunity to develop this evidence, we will be able to confirm what I believe as a matter of common sense is true, which is that when you have a group of people coming on the solicitation of a free offer to sell a timeshare, most of the people who arrive in that location come with a commitment that they're not going to buy anything. They're going to come, they're going to put in their time, they're going to listen to whatever they have to say, and they're going to leave, and they're not going to buy anything. But that suggests that it has less to do with the tape and more to do with the customer motivation. No. TrendWest itself admitted in the testimony of its executive vice president in charge of this process that a vital and essential element of every timeshare sales activity is a compelling video to put the buyer in the picture. That's his words. So they admit, I mean, TrendWest is the king of timeshare sales. They sold, just during the relevant period, a billion dollars plus of these units. So they know how to sell these things. And I would suggest to the court that a vital, and I think we will be able to develop expert testimony that confirms this, because I believe as a matter of common sense it's true, that to sell something to somebody who has a preconceived commitment not to buy it, it's vitally important how you use your first moments with that person, and particularly in the part of the presentation when it is not a sales presentation, when you're not face-to-face with a salesman, where you're just sitting, waiting, being left alone, and passively on a screen is what? Images, seductive images, Mr. Lynch's images of exotic locations that get you in the mood. But those same images are being displayed during the podium presentation. No. Only a small part of those. You're saying only 90 seconds, but it's the same seductive images, to use your phrase. Well, it's a smaller slice of them, but it's qualitatively different. As I say, I don't have evidence to prove this, because I've never had a chance to do the evidence. But you do about the podium tapes. I still am having a hard time understanding why couldn't you pursue discovery on that theory if it is a viable theory? We had evidence that was not allowed to be presented because the court summarily dismissed the profits part of the case. We had witnesses who were prepared to test. The court, and I was not the trial attorney, but as I understand it, the court ruled on a Dauber motion that two of our witnesses who were prepared to present expert testimony, who were timeshare sales practitioners, would have offered opinion testimony about the causal relationship. But she ruled that they were not qualified under the Dauber test to be experts. But she did not exclude their testimony as recipient witnesses who could testify about customer practice in this business. But they never got to testify about that because literally days before trial, the judge reversed her earlier denial of summary judgment and issued an order granting summary judgment. And that goes to the very heart of it. That would have all been part of the prior appeal. Not that loop tapes wouldn't have been part of the prior appeal. No, but the question about the qualification of those witnesses was all part of your prior case, right? That's not the motion for reconsideration. That's not the 60B motion. No, it is not. I'm just trying to give you my best understanding of the context at the time and why this withheld evidence is so vitally significant. When the court considered summary judgment the first time, she denied it and said that the temporal relationship was enough of a causal nexus to allow Mr. Lynch to go to the jury with his indirect profits claim, which is obviously in a context where the plaintiff realized, or the defendant rather, realized a billion plus of revenues and probably hundreds and hundreds of millions of profits. We're talking serious dollars, even if you're talking about a 1% causal relationship. So she said there was a causal relationship. Then after discovery was closed, they present declarations saying, well, we have two of our offices that didn't use Lynch material and nothing changed. That became, in the court's mind, evidence, proof that maybe there was no causal connection. What she had before was not enough to carry forward, and Mr. Lynch had to come forward with his own evidence to meet that evidence, and he did not. What he did was to argue that that should not have been sufficient to change the ruling because it was a statistically insignificant amount of evidence of what happened for a period of months in two offices out of a total of 42. It shouldn't have been enough to change the view he contended. It shouldn't have been enough to change the result. He was wrong. The judge thought it was enough to shift the burden. He did not respond. He did not present as part of the opposition to summary judgment the available testimony of these other witnesses about causal relationship, and there it lay, and this court confirmed on appeal that he basically had procedurally failed to carry forward his burden by not producing any affirmative evidence. But at that time, part of what was withheld from the court was the fact that indeed it had not occurred that even in the two offices they'd stopped using Lynch material because we now know that in at least one of them, and possibly both, we don't know because we haven't been able to do the discovery, they continued to use the Lynch material in the loop tapes, and that was omitted from the declarations. Now, they've contended in their opposition or in their respondent's brief that we're mischaracterizing what the court said, but I would suggest that we're not mischaracterizing what the court said. If I may just read the relevant portion of the ruling granting summary judgment on the renewed motion. The court said, Trend West has again moved for summary judgment on the issue of profits. In support of this argument, Trend West has put forward evidence that two of Trend West's offices, which did not use either the podium or the take-home videotapes, experienced no decrease in sales and no increase of rates of rescission. So it is manifest that what those declarations persuaded the court at that time, whatever they literally said, if you want to pick them apart, they persuaded the court at that time that there were two offices with no Lynch material, and that suggested to the court that now Lynch had to come forward and prove that his material made a difference. But there was Lynch material. Just to make sure, you're reading from Judge Peckman's August 22, 2001 summary judgment? I am, which appears at the excerpts of record, page 47. 47. Yes. So in a case in which Mr. Lynch is suing for infringement of his copyright, and where on a quantitative basis, and if I go back, I don't want to leave the point. With regard to the actual damages, just taking what was presented at the trial in actual damages, Mr. Lynch presented his damage analysis that even at his per-unit duplication rate, the damages should have computed out to $386,000. The jury actually awarded $88,000. Now, they were not required by any special verdict to explain how they computed that number, but all they knew about TrendWest's activity in making that decision was 90 seconds worth of stuff before the sale and the take-home tapes. Had they known that in addition to that, TrendWest had made tens of thousands of public performances in what we contend is the most critical phase of the sale process, which is getting the people out of their reluctant mood and into their maybe-I'm-interested-in-this mood, which is the loop tapes, how do we know that the jury might not have made a different judgment and given Mr. Lynch all or at least a much more substantial part of even that $386,000? So even at that limited level, he's been denied a fair trial because our burden, I don't think there can be any fair doubt that there has been misconduct here. And our burden was just this. Well, Mr. Clark found that it was not intentional, didn't she? Which is? The district judge found that the misconduct was not intentional. Well, I don't know that what she found or if she did or didn't find it was unintentional. It seemed to me, let's assume for the sake of argument that she did find it was not intentional. I would say that finding is an abuse of discretion. Abuse of discretion or clearly erroneous, that's a factual finding, is it not? It's a factual, well, an abuse of discretion can be predicated on a clearly erroneous finding of fact. How is it clearly erroneous? Well, I'll tell you how it's clearly erroneous. This is only one example. And we've made great efforts in our reply brief to detail each and every one of these points, and I would invite the Court's attention to that again to reemphasize it, but I don't have time to repeat all of it. But let me just go through one particular significant chronology. Mr. Stearns, the executive VP in charge of marketing, is the gentleman who verified all of the productions of tapes. In the first production of tapes, the 1997 loop tape, the one that was destroyed, was not identified or produced. In a second supplemental production just before trial, and this is on the timeline that the counsel was kind enough to create, July 12th, there's a second supplemental production. Now they identify something called the 298 loop tape. They still don't identify the 97 loop tape. In October 22, just three months later, the same Mr. Stearns sends a memo or authorizes a memo to be sent to all of the sales offices saying, eliminate all the loop tapes you're using, which they did. There's a little quibble about whether they ordered them destroyed or just eliminated. The result is the same. They were all destroyed based upon the memo saying, eliminate all these tapes. Wasn't that done in response to your complaint? Absolutely not, Your Honor. In fact, that was done in derogation. You filed for an injunction, though, didn't you? Pardon me? You filed for an injunction. To assemble and turn over all of the tapes. They're saying that we made a motion for the court to order them to assemble and turn over to us for destruction of all the tapes, and they simply, before the judge had ruled, decided, well, that's a good idea. We'll just destroy them ourselves. That's not permissible. But if a defendant is on notice that you have an infringement claim, why is it improper for a defendant to take steps to stop the alleged infringement? Stopping is fine. Destroying is a wholly different proposition. We're now in a situation where, in terms of what was actually on those loop tapes, we have two issues, do we not? We have a destruction of evidence issue as it affects discovery, but we also have efforts on the part of the defendant to stop committing further violations of the infringement, don't we? No. I submit we do not. Efforts to stop an infringement? You're saying that it was done for an improper purpose. Absolutely I am. But you wanted the defendant to stop infringing the copyright. Sure, we wanted that from the time we filed the lawsuit in 2000. And why isn't it effective for a defendant to tell its employees, stop using those tapes? If that's what they'd said, I might not have an argument, because then the tapes would still be there. That gets to the destruction and how it might impact on discovery. All I'm asking you is why isn't it appropriate for a defendant to try and take action when a lawsuit is filed against it to make sure that it is not continuing to engage in infringing conduct on an ongoing basis? I think it is appropriate, and our argument is not that they did so. In fact, it would have been more appropriate for them to do so when we sued them a year and a half earlier. But that's not the reason I'm alluding to this point. The point is, what does the record show about intentional misconduct? In July, Mr. Stern certifies a supplemental production that doesn't include the 1997 loop tape, doesn't describe it, doesn't produce it. Three months later, he tells all of his offices, so he obviously knows they are using that loop tape, eliminate using it. He's concerned about infringement. Are we to believe that he just forgot in July of 2001 that this tape was out there being used, even after the lawsuit was filed and as the trial was approaching, and then he suddenly remembered it in October and said, oh, eliminate using it. I will submit to your judge's good judgment whether that is even remotely plausible. Do you want to save a minute and 12 seconds for rebuttal? Let's hear from him. You gave him that at the beginning. That's right. We actually have more, but that's all right. We'll hear from Mr. Sayle. May it please the Court. Jerry Sayle here for the Appali Trent West Resorts. Obviously the question before the Court is whether CR 60B3 applies in this case, whether there was an abuse of discretion by the trial court in failing to provide relief from the judgment. In order to obtain relief, plaintiffs must show by clear and convincing evidence that there was misconduct. And as a result of that, he was unable to fairly present his case. Misconduct or fraud? They allege fraud, and they can allege fraud, misrepresentation, or misconduct under the terms of the. . . But they frame it as a fraud case? They do, and they do so for the reason that they argue that if it's fraud, that is, if it's intentional, then there's a burden shifting. That is, then the second half of the test shifts over to the defendant to prove by clear and convincing evidence that the trial was not interfered with. There's been no amendment of pleadings, and I understood this, in my reading of it, that it was a fraud assertion. In regard to the relief from stay? Yeah. I think that's absolutely true. It was a fraud assertion. I think the court can. . . I mean, we see it here. That brings us back to the hyperbolic rotamontade, which were not my words, by the way, but a quote from a court of appeals, but I like it. It brings us back to exactly that issue, that they are trying to show that there was fraud because it serves their interest to prove that. However, they can also prevail under CR 63B for misconduct that can even be accidental. Did they plead misconduct? In regard to the relief from stay, I'm not sure, Your Honor, and I don't understand the motion in terms of pleading. Some of this has been going on from the very beginning here. There's been a lot of shifting sand in this case from one position to the next. I mean, the trial court dealt with it as she saw fit, and I'm not going to get into that. But what I understand to be here is under subsection 3, fraud. That's all we're interested in. In that case, if that's the only thing we're interested in, Your Honor, I think it makes it easier. Am I wrong? I mean, straighten me out if I'm off base, but that's the way I read the setup. I guess I would like to say that you're right, and I'm not prepared to say that. It's not a pleading, of course, the motion. The motion is their attempt to get relief from stay. But you're asking for some specific relief. If I'm sitting in a trial court, I'm not going to give you a whole lot of relief you don't ask for. Yes. I understand. There's no reason I've got to go off into the duly someplace. Certainly in response, in the court's order, the court dealt with it both as a possibility of intentional and as a possibility of misconduct, something less than intentional. And I took my cue from that, Your Honor. You may be absolutely correct that the only thing they asked for is for the court to find that there was fraud, and on the basis of that fraud, that they do a relief from stay. You may be absolutely correct. I took my cue from the court's order and considered whether or not it would be misconduct as well. I did want to point out very much that it is not intentional, or more to the point that my point would be there's no clear and convincing evidence that there's fraud, but more to the point that there is no abusive discretion if the court found that there was no intentional behavior. And, of course, that's the test here. I get the impression very clearly that what my opposing counsel would like this court to do is to make that decision themselves about whether or not there was fraud, as opposed to consider, which, of course, it is this court's duty, that whether or not, in deference to the trial court, whether or not the trial court was correct that there was no fraud under these circumstances. And if you'd like me to talk about those facts, that was one of the things I was going to do, is talk about the facts that were presented to the trial court and how they wouldn't show clear and convincing and certainly wouldn't show any abusive discretion in regard to that question, that is, intentional concealing. You argue your case as you want to present it. All right. In regard to that, and I did prepare the partial chronology, plaintiff asked for all the tapes in discovery. That was the very first thing that came out. He was presented with some tapes in response to that. He also asked that those tapes be characterized. And in response to that, the tapes weren't characterized. Now, there was not a follow-up to that by plaintiff. And believe me, I am not trying to suggest that they were at fault, as they say I'm trying to suggest. All I'm trying to suggest is what the evidence was about what the parties did. There was no follow-up to ask about what the particular tapes were used for in response to that question. Trend West never denied that the tapes it had were infringing, that is, that they used Mr. Lynch's materials. That was not what their case was based upon. Their case was based upon the idea that although they used the material, they had permission to use it. It was not necessary for them to hide the use of that material because they were simply arguing that they had permission to use it all along. At Mr. Stern's deposition, he was asked questions about the tapes that were produced, and he answered those questions. Now, he didn't talk about loop tapes. He wasn't asked about them. Does that give some indication that he was lying, that he was concealing the loop tapes? I'd suggest that it could but likely does not. Hadn't they asked for all the tapes, though? They had asked for all the tapes. And you didn't produce all the tapes? There were tapes produced at the beginning. You didn't produce the loop tape? Later on, and to just make it clear, later on there was a supplementation that's mentioned in that chronology in July, where there's a list of all the tapes that were provided. That supplementation lists tapes that were provided. Mr. Lynch's declaration, in fact, indicates that the tapes were provided earlier than that date, and there's a list of those tapes. Among those tapes is a loop tape. It's not the 1997 loop tape. It's another loop tape, but it was presented. And did that have Mr. Lynch's material in it? It did have Mr. Lynch's material. Now, in the hyperbolic rotamentat of the other side, they mentioned that it was largely stripped. That is, Mr. Lynch's material was largely stripped, as they say, from that second loop tape. But obviously, I should think it's obvious, if it was the intention of Trend West to give them a loop tape which did not have any infringing material, they would have stripped it all. They wouldn't have partially stripped it. When you say stripped, how much material are we talking about? How much Lynch material was in the 1997 tape? In the 1997 tape, according to Trend West, which is the only evidence that we have because that tape doesn't exist, according to Trend West, it was the same amount of material as in the take-home tape. Which is what, six minutes? I believe that's correct. Okay. And in the 1998 tape, how much Lynch material was there? Very little. Okay. And what do you mean by very little? My understanding is that there was a montage, and in the montage, some of Mr. Lynch's material was contained in that, and I don't know how long that montage was. Fifteen seconds? We're talking 50 seconds? I don't know. I would say 15 seconds is probably more accurate, but I do not know the answer to that question. So if you were looking at the loop tape and comparing it with the other two tapes, the podium tape and the take-home tape, you might have thought that this was nearly de minimis, and that your better shot might have been to focus on the other two tapes. That's quite possible. In fact, I don't think anybody recognized that that loop tape, which was produced, was a loop tape during the course of the litigation. That is, counsel for Trend West didn't recognize that to be the case. I don't think counsel for plaintiff recognized that to be the case. What I'm talking about is whether or not there's clear and convincing evidence that it was Trend West's intent to hide that information. But you don't dispute that Trend West did not produce the 1997 tape and that it was fairly within the discovery request. It should have been produced. That's correct. We don't deny that. And the other point that Mr. Stearns made in his deposition is he thought that it had been. I think he thought that all the tapes had been produced. And then the point is, of course, in regard to the destruction of the tapes, exactly what this court was discussing before, that Mr. Stearns, after the verdict was entered in this case and sometime after a motion for preliminary junction had been filed, directed that the tapes be destroyed. Now, we don't actually know when it was. We only know that the earliest date was October 22. It may have been after the the permanent injunction order was entered or it may have been before. We don't know that information. Mr. Stearns recollection of the date was completely faulty. He thought it was earlier than that. So those tapes were destroyed, but they were destroyed under the circumstances that the opposing side wanted there to be no infringement. Right. But we could have had no infringement by, for example, sending all the tapes to you. Correct. Correct. Now, what the other side has said is that their complaint says that they want to have all the tapes turned over to them for destruction. The record doesn't show what their motion for preliminary injunction shows. We can only somewhat infer that from the court's order because that's not in the excerpt of record in this case, at least. Or I didn't read it in the excerpt of record in this case. It appears that they asked for all the tapes to be, that is, in their motion for preliminary injunction, they asked for all the take-home tapes to be requested back or at least a notice be given to everybody. It's a little difficult. I heard you say a few minutes ago that Mr. Stearns in his deposition in September 2000 wasn't asked about the loop tape. It's a little difficult to say that if all you've been provided is a 1998 tape, which, as I understand it, you didn't even provide that until July of 2001. Is that correct? No, that's not correct. The notice went out in July of 2001 saying that they had been provided. Mr. Lynch's declaration at excerpt of record 183 indicates that those tapes were provided in the spring of 2001, and I expect that's correct. But his deposition was in 2000. Stearns. Stearns, Stearns' deposition. I heard you say that. I heard you say that Stearns' deposition, that Mr. Stearns was not asked about the loop tape. That's correct, and it's absolutely correct that the other side did not have any information from Trend West at that time to indicate that loop tapes existed. That's exactly right. Now, what they had asked for is that, in response to the discovery, is that each of these tapes be indicated as to the reason why it was used. That question was not answered, and it was not pursued. Whether there was informal discussion, I don't know, but nothing on the record shows. In response to my question to Mr. Loomis, he said that had they known of the loop tape, they would have presented two different theories of damages depending on the tape, that for the podium tape or the take-home tape they would have argued for their duplication fees, and on the loop tape they would have argued for performance damages. Now, would it have been inappropriate for Mr. Lynch to have requested two different measures of damages under the copyright laws? I'm afraid I don't know whether the answer is whether it would be inappropriate legally. I expect not, but I don't know the answer to that, but whether or not it would have been practically something he wanted to do is something else altogether. That certainly would have given them a different measure of damages. The district court said on the 60B motion that if we calculate the loop tape based on its duplication value, that we come up with about $300, which clearly has been consumed in the last 15 minutes in argument here. Yes. But if you were to request performance damages, you might come up with a substantially different figure. You would come up with a different figure in terms of licensing. That's true. The licensing would be determined a different way, and I don't know what that number would be. What measure of damages did Mr. Lynch seek on the take-home tape, which had six minutes of his material? On both the take-home tape and the podium tape, he sought only the duplication damages. And that's because the take-home tape was produced by the thousands. That's correct, over 100,000. Correct. So that would make sense that if you had to sort of elect a remedy on the take-home tape, that you would choose the higher measure of damages. Correct. Okay. But he also testified that he only does it one way, and that was the testimony that was in his, I think it was trial testimony. It may have been his deposition testimony, but I believe it was the trial testimony, in which he said, I am not in the stock business. I do not sell my images. The only way I do this is if I get the copying fee. Now, later, he submitted an affidavit in which he said, well, I might give it a different consideration if, in fact, I had known about the loop tapes. But as has been pointed out, he didn't do that in regard to the podium tape. If he were fully informed on the damages available under the copyright laws, he might have thought differently about his position, wouldn't he? Well, that may be right. But he didn't do that differently in regard to the podium tape. And the suggestion now that the loop tape was so vastly more important than the podium tape, I think is a little makeshift for the purposes of this argument. Obviously enough, the loop tape is some kind of wallpaper when they come in, and it is to set up an image. That's absolutely true. But then the podium tape, the attention is drawn to the podium tape in the part of the process. I think it's a very much different kind of thing in which, on one case, they're asked to focus on the images, and in the other case, it's simply background. I think the idea that the loop tape was so much more important because it was the first thing is a makeshift argument for these purposes. I wouldn't expect, based upon Mr. Lynch's testimony of how he charges for these things, that he would have done anything different in that regard at trial than exactly what he did. The other point, obviously enough, is the indirect profits. And I would point out that although the court, in the first summary judgment, mentioned in regard to indirect profits that there was at least some temporal relationship, the court understood and ruled in regard to the second summary judgment motion that a temporal relationship wouldn't be sufficient. Under the law of this circuit, there has to be something more than that. There has to be some evidence that there is a causal connection, and simply the timing won't do it. There was no evidence presented in regard to the second summary judgment, none whatsoever that would support any causal connection. It was not presented by plaintiff's attorney in any regard. The court did not need to rely upon the evidence, admittedly anecdotal evidence, from TrendWest. TrendWest did not do a study of the impact, but TrendWest did have a couple of occasions in which some tapes were not used. TrendWest has never said, by the way, that these were lynch-free offices or anything of the sort. If you take a look at what the declarations say, they're very clear that at a certain period of time, in one office they did not use take-home tapes. And it doesn't mention whether or not they were using the podium tapes, but we can assume they were, so that the podium tapes were still there with the offending material in them. They did not use take-home tapes, and it had no effect on rescission. In another office, they did not use podium tapes. It doesn't say anything about take-home tapes in regard to that office, even though that same declaration talks about take-home tapes. So it's just in that office they were not using podium tapes, and it didn't have any impact on the sales for similar start-up offices. That is not statistical evidence of any sort. It is merely anecdotal evidence. But it does indicate that, to some extent, the use of these tapes doesn't have an immediate impact. And the burden stayed with plaintiff to show that these tapes would have an impact, would have a causal connection to the profits of TrendWest, and they had nothing. They only criticized the position of TrendWest. They did not come up with anything themselves. So the indirect profits, which has been decided, is the law of the case, cannot be reopened on the basis that yet there were yet more images as to which a causal connection cannot be shown. I am not sure I hit every point, but I certainly hit both of the points that I wanted to make, which is that in regard to the allegations that there was intentional concealment, there are facts from which that could be inferred, I suppose, and they have certainly done that. But their saying it is true does not make it true. Certainly, it could also be determined that there was not, and I suggest it is much more likely, that there was not intentional concealment by TrendWest. And the question here is whether the trial court abused its discretion in finding or in failing to find that there was any intentional concealment, and I think it is very clear that they did not. That being the case, the only thing we would have left, if it is left, is the question of whether there is misconduct. I would point out and I did not point out that in regard to the Calvert case, the question of the destruction of the tapes became one of spoliation, because there, the tapes were destroyed while there was ongoing litigation in that case. And in that case, Judge Zille found that there was no bad faith. Under the same facts, as they apply to the Calvert case, Judge Zille found that there was not an intent by TrendWest to destroy these tapes for the purpose of advancing its position in the litigation, in the Calvert litigation. And I suggest that it is the same thing here. I have run out of time. We would ask that the Court be affirmed, and thank you for your time. Thank you, Mr. Stauffer. Mr. Willis. Thank you, Your Honor. Very quickly, if I may. First off, to respond to Judge Beezer's question, we are not risking our case solely on fraud, and as I think is clear in the reply brief, if not in the opening brief, we believe that the record supports reversal under 60b-3 for misconduct. We do believe the record shows fraud, but we're not saying that unless it's fraud, we fail to meet our burden. On the contrary, we think we have. Regarding the evidence of misconduct, the 298 tape bears note. The tape that they produced in July of 2001, which is described as the lube tape, which had very little Lynch material, was labeled, World Mark the Club 298, 2-98, which implied it's a 90-98 tape. But we know it wasn't a 90-98 tape because in October of that same year, they were instructed to destroy the then-current lube tape, which was the 97 tape. So why did they affirmatively produce this and label it the 2-98 tape? I think that is an inference. There's an inference that arises from that of some intent to sandbag Mr. Lynch. Regarding the Kalber case, Judge Giselli specifically said he was not allowed to make a determination of their conduct based upon events in Lynch. He could only decide on the events in his record, and therefore he did not find bad faith on his record, but he certainly made no judgment whether there was or wasn't bad faith in the Lynch proceeding. And finally, it is not just the lube tape. They also withheld production and overcame a motion to compel the perspectives tapes, which Judge Peckman said had the same material, but the record shows it didn't. It had additional, completely different cockerated material. They were allowed not to produce those by presenting a declaration by the person who created them, saying under oath they had no Lynch material. The person who created them said that, and they did have Lynch material, as was only incidentally discovered through discovery in the Kalber case. And Mr. Lynch has still never even had a chance to see those particular tapes to determine how much of his material they have because they're under seal, and he's not been allowed to look at them. So it's also a totally exaggerable infringement of copyright with regard to the perspectives tapes where there was complete suppression of that based upon a perjured declaration by the gentleman who edited them who said they had no Lynch tape, and they did. All right. Thank you. I've let you go over a little, but that's all right. The case just argued is submitted, and we'll hear argument in the next case of the United States v. Gibbons and Gibbons.
judges: Beezer,tallman, Bybee